UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                  :
STEVEN SAFRAN,                                    :
                                                  :
                          Plaintiff,              :        17-CV-1648 (KMK-JCM)
                                                  :
             -against-                            :        **THIRD AMENDED COMPLAINT**
                                                  :
UNITED HEALTH PRODUCTS, INC.                      :        **JURY TRIAL DEMANDED**
and DOUGLAS BEPLATE,                              :
                                                  :
                          Defendants.             :
-----------------------------------------------------------------x

     Plaintiff Steven Safran ("Safran"), by and through his attorneys, Cerasia & Del Rey-Cone LLP, for his Third Amended Complaint against defendants United Health Products, Inc. ("UHP") and Douglas Beplate ("Beplate") (collectively, the "Defendants"), alleges as follows:

## NATURE OF ACTION

     1.    Safran commenced his employment with UHP as the Senior Vice President of Marketing in September 2014.  The terms of Safran's employment were memorialized in the Employment Agreement, dated September 15, 2014, which was signed by Safran and by Beplate on behalf of UHP.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.  Under the terms of the Employment Agreement, Safran was to receive "a base salary of . . . $8,333 . . . per month," which amounts to an annual salary of approximately $100,000.

     2.    During Safran's employment from September 2014 through April 28, 2017, when he was constructively discharged, UHP and Beplate willfully refused and failed to pay Safran his agreed-upon salary of $8,333 per month, except for paying him a total $16,000.  Thus, the Defendants are liable for breach of the Employment Agreement and breach of the implied covenant of good faith and fair dealing, and owe Safran no less than $245,823.50 in unpaid base

salary for approximately 29½ months.  In the alternative, the Defendants are liable to and owe Safran his unpaid salary of $245,823.50 based on the theory of promissory estoppel and/or fraud and misrepresentation.

3.      Under the Employment Agreement, the Defendants also agreed to pay Safran "a commission each month equal to 2½% of net sales (gross saless less returns) on his managed accounts."  As explained below, Safran is entitled to a commission on at least one significant sale on an account he managed, and for other sales.  By failing to pay Safran his commission, the Defendants are liable for breach of the Employment Agreement and breach of the implied covenant of good faith and fair dealing with respect to the commission.  In the alternative, the Defendants are liable to and owe Safran his unpaid commission based on the theory of promissory estoppel and/or fraud and misrepresentation

4.      Given that the Defendants continually failed to pay Safran on a "salary basis" under the wage and hour laws, except for the months of October 2014 and March 2015, he also is entitled to a significant amount of overtime pay under the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

5.      In addition to the Defendants' refusal and failure to pay Safran all of the wages due to him, they also have failed to repay him for a $50,000 loan that he made to them in September 2014, failed to repay him for a $30,000 loan that he made to them in the Summer of 2011 to help secure the formula and procedure to manufacture in the U.S., and failed to issue him at least 250,000 shares of UHP common stock.  By failing to repay this money to Safran or issue him the stock, the Defendants are liable for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraud and misrepresentation and/or conversion.

6.      Safran has tried in good faith to obtain his unpaid wages, the shares of UHP stock and the repayment of the loans from Defendants, but they have refused to pay him this money or issue him the stock.  Instead, Beplate threatened Safran for making the demands, which constitutes retaliation against Safran in violation of the FLSA and NYLL.  As a result of the Defendants' retaliatory conduct and continued failure to pay Safran any wages, he had no choice but to resign from his employment, effective April 28, 2017, and thus was constructively discharged by the Defendants.  Beplate also continued to threaten and retaliate against Safran even after his employment ended.

7.      Consequently, the Defendants gave Safran no choice but to bring this lawsuit against them to obtain unpaid wages, compensatory damages, liquidated and punitive damages, UHP stock and equitable relief under the common law and for their violations of the FLSA and NYLL.

## **PARTIES**

8.      Safran is a citizen of the State of New York, and worked out of his home for UHP in Rockland County, New York.  Safran never worked for UHP in any location other than New York, from which he called upon and generally communicated by phone or email with customers or potential customers of UHP that were located in remote states, such as California, Florida, Massachusetts, Minnesota, and other states, and thus was engaged and worked in interstate commerce as defined in the FLSA, 29 U.S.C. § 203.

9.      UHP, which is a publicly-traded company, maintains its principal place of business in Henderson, Nevada.  During all times relevant to this lawsuit, UHP has transacted business within the State of New York and this District.  Upon information and belief, UHP has "gross volume of sales made or business done" of $500,000 per year.

3

10.     Beplate, who is UHP's Chief Executive Officer and, upon information and belief, is the majority shareholder in UHP, resides in California.  During all times relevant to this lawsuit, Beplate has transacted business within the State of New York and this District, as well as within the State of Nevada.

11.     At all times material hereto, UHP and/or Beplate were Safran's employers within the meaning of the FLSA and NYLL.  In addition, at all times material hereto, UHP was liable for the actions of Beplate, its Chief Executive Officer, and for any of its directors and officers, under the doctrine of respondeat superior.

## JURSIDICTION AND VENUE

12.     The causes of action which form the basis of this lawsuit arise under the common law, FLSA and NYLL.

13.     This Court has jurisdiction over Safran's FLSA claims pursuant to 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over Safran's NYLL and common law claims under 28 U.S.C. § 1367(a).  Alternatively, the Court has diversity jurisdiction over all of the claims under 28 U.S.C. § 1332, given that the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and conduct set forth herein, occurred in this District and the Defendants transact business in this District.

## FACTUAL ALLEGATIONS

15.     Safran is a well-respected marketing professional.  He commenced his employment with UHP in September of 2014.

16.     UHP hired Safran as its Senior Vice President of Marketing in September 2014. He worked for UHP out of his home in Rockland County, New York, from September 2014 through April 28, 2017, when he was constructively discharged by the Defendants.

17.     Upon hiring him, UHP agreed to pay Safran a salary of $8,333 per month, or an annual salary of $100,000.  On September 15, 2014, Safran entered into an Employment Agreement with UHP, which was executed by Beplate on behalf of UHP.  Under the terms of the Employment Agreement, UHP promised to pay him "a base salary of . . . $8,333 . . . per month," along with "a commission each month equal to 2½% of net sales (gross saless less returns) on his managed accounts."  (Ex. A, Employment Agreement, ¶ 4(a).)

18.     In accordance with paragraph 4(b) of the Employment Agreement, upon execution of the Employment Agreement, UHP issued Safran 3,500,000 shares of UHP's common stock, as reflected in a stock certificate dated on December 12, 2014.

19.     While Safran continued to perform work for UHP as the Senior Vice President of Marketing from September 2014 through April 24, 2017 – when he gave his notice of forced resignation and construtive discharge, effective on April 28, 2017 – the Defendants willfully and in bad faith failed to pay Safran his $8,333 monthly salary under the Employment Agreement for September 15 through September 30, 2014, November 2014 through February 2015, and April 2015 through April 28, 2017 – amounting to no less than $245,823.50.  During Safran's employment, UHP paid him wages only two times: once on October 21, 2014, in the amount of $8,000 for "Oct pay" and a second time on March 9, 2015, in the amount of $8,000.

20.     Because the Defendants willfully and in bad faith refused to pay Safran no less than $245,823.50 in the salary it owed him, they also are liable for an equal amount of liquidated

damages under the NYLL ($245,823.50), and thus owe Safran a total amount of $491,647 relating to his unpaid salary.

21.     Given that UHP has failed to pay Safran on a "salary basis" under the FLSA and NYLL, he also is entitled to overtime pay for all of the hours that he worked over 40 hours per week.  The amount of overtime pay owed to Safran is substantial, given that he regularly worked in excess of 60 hours per week throughout his employment.  Consequently, based on a monthly salary of $8,333 or $2,083.25 per week, Safran's regular hourly rate of pay was $52.08 per hour, and his overtime rate under the FLSA or NYLL was $78.12 per hour (*i.e.*, 1.5 times his regular rate of pay).  Thus, based on his overtime rate, the Defendants owe Safran at least $162,489.60 in unpaid overtime pay from November 2014 through December 2016 (at $78.12 per hour for 20 hours per week, or $1,562.40 per week for 104 weeks) – not including an equal amount ($162,489.60) in liquidated damages, which brings the total of unpaid overtime pay and liquidated damages to at least $324,979.20.

22.     The Defendants owe Safran no less than $816,626.20 in unpaid wages, representing $245,823.50 in unpaid salary, $245,823.50 in liquidated damages for the wilfull failure to pay him his unpaid salary, $162,489.60 in unpaid overtime pay and $162,489.60 in liquidated damages for the wilfull failure to pay him overtime pay.

23.     Interestingly, by text message on February 7, 2017, Beplate informed Safran in writing that the Defendants do not owe him any wages, claiming that he allegedly told Safran that "we can't go forward on the contract [*i.e.*, the Employment Agreement] 2 years ago." Safran, however, never agreed to modify or amend the terms of the Employment Agreement, and he never received any notice of termination – let alone written notice of termination of, or modification to, the Employment Agreement – as was required under paragraphs 7, 11 and 16 of

the Employment Agreement.  Regardless, the Defendants unlawfully and willfully failed to pay Safran *any* wages for his work, except for a total of $16,000.

24.     In the unlikely event that UHP or Beplate is not deemed to have breached the Employment Agreement or Defendants can prove that the Employment Agreement was properly terminated, as Beplate claimed for the first time in February 2017, but which Safran denies, then, in the alternative, the  Defendants are liable to Safran for failing to pay him the applicable minimum wage rate in New York of $8.75 per hour in 2014, $9.00 per hour in 2015, $9.75 per hour in 2016, and $10.75 per hour in 2017, plus overtime at the rate of one and one-half (1½) times the applicable minimum hourly wage rate and an equal amount in liquidated damages. Thus, with overtime to account for Safran's 60-hour workweeks, the Defendants owe him at least $76,885.60 in unpaid wages under the NYLL, as follows:

(a)     for November and December 2014, he is owed at least 320 hours of pay at $8.75 per hour and 160 hours of overtime pay at $13.13 per hour for a total of $4,900.80;

(b)     for 2015, he is owed for approximately 1,840 hours of pay at $9.00 per hour and 880 hours of overtime pay at $13.50 per hour for a total of $20,440 (after subtracting the $8,000 that was paid to him in March 2015 for 240 hours of work in that month);

(c)      for 2016, he is owed for approximately 2,000 hours of pay at $9.75 per hour and 960 hours of overtime pay at $14.63 per hour for a total of $33,544.80; and

(d)     for four months in 2017, he is owed for approximately 160 hours of pay at $10.75 per hour for a total of $18,000.

In addition, Defendants would owe Safran an equal amount of $76,885.60 as liquidated damages, for a total of $153,771.20 under the NYLL.

25.     Despite the Defendants' willful and bad faith failure to compensate Safran, he continued to work diligently over the years.  For example, Safran was primarily responsible for securing a $20 million sale for UHP with a California-based company, which UHP touted in a press release.  This success reflects Safran's continued dedication to UHP and his tireless efforts. Indeed, Safran negotiated with the buyer-company for over a year, which resulted in UHP benefiting from one of the largest new business deals.  Safran continued to do his work and remained in discussions with other customers and potential accounts throughout his employment, including making some sales to those customers.  Beplate recently acknowledged and admitted that, when the California-based customer in question makes payments on that sale, UHP is obligated to pay Safran a "2.5% commission" on that sale "if and when it happens."  Upon information and belief, UHP has sold or been selling products to the California-based company in question, as well as to other customers, based on Safran's sales activity, and thus owes Safran commissions on 2½% of the net sales to date to those customers.

26.     In September 2014, Beplate told Safran that if he gave UHP a 30-day loan of $50,000, UHP would give Safran additional shares of common stock and repay the $50,000 loan in full.  Beplate told Safran that he and UHP's Chief Financial Officer had done this, too.  In reasonable reliance on Beplate's promises and representations, Safran made a check payable to Beplate's wife (as requested by Beplate) in the amount of $50,000 and Safran clearly stated on the check that it was a "loan" to UHP.  A true and correct copy of this check is attached as Exhibit B.  To date, Safran is still waiting for the loan to be repaid, as well as the additional shares of UHP common stock.  The Defendants' conduct gives rise to claims for breach of contract (including, for example, a violation of UHP's Code of Business Conduct and Ethics),

breach of the covenant of good faith and fair dealing, promissory estoppel, fraud and misrepresentation and/or conversion.

27.    In July 2011, prior to commencing employment with UHP, Safran also loaned UHP and Beplate $30,000 to help UHP secure the formula and procedure to manufacture UHP product in the U.S.  In an email dated July 26, 2011, Beplate promised Safran that the $30,000 loan would be repaid within 45 days thereafter.  Specifically, Beplate stated:  "Steve Safran advances 30k US Dollars to Beplate – In return Steven Safran receives 475K free trading shares and the return of the 30k (note) from Beplate payable within 45 days."  A true and correct copy of the July 26 email is attached as Exhibit C.  To date, however, neither Beplate nor UHP has repaid Safran the $30,000 for the loan.  The failure to pay Safran this money gives rise to claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, fraud and misrepresentation and/or conversion.

28.    On November 15, 2015, Beplate strongly urged Safran to sell 1 million shares of UHP's common stock in an off-market transaction at $.045 per share, for a total of $45,000 – even though the stock was trading at $.10 per share at the time.  Beplate promised that Safran would be paid the $45,000 no later than December 2015.  In addition, Beplate unconditionally promised to provide Safran with at least an additional 250,000 shares of UHP common stock if Safran allowed him to hold Safran's unsold 500,000 shares for three months, which would be no later than March 1, 2016.  But, Beplate did not follow through on his false promises.  Safran continuously requested full payment on the sale of his stock for approximately 15 months, but Beplate continuously ignored his requests to be repaid in full and in a timely manner.  Beplate did not pay Safran in full for the $45,000 stock transaction until making a final installment payment of $12,500 on February 2, 2017, and that was only after Safran complained once again

about the failure to pay him.  Moreover, to date, the Defendants have not issued Safran at least

the 250,000 additional shares of stock that Beplate promised to issue to Safran if Safran allowed

him to hold onto Safran's 500,000 unsold shares until March 1, 2016 (and Beplate did not even

return the stock certificate for the 500,000 shares to Safran until February 2017).  The

Defendants' failure to issue Safran at least 250,000 shares of common stock of UHP gives rise to

claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory

estoppel and/or fraud and misrepresentation

29.     Safran attempted, in good faith, to be paid for his work as an employee of UHP,

but the Defendants willfully refused to pay him and retaliated against him.  In fact, Beplate

blatantly retaliated against Safran by threatening him, starting in 2015, for demanding his unpaid

wages and complaining about the Defendants' violations of the wage and hour laws.  In writing

on February 7, 2017, Beplate called Safran "a manipulator" and specifically threatened to

disclose alleged personal information about Safran and air purported "dirty laundry" about

Safran that was unrelated to his job or the dispute.  This conduct added to the hostile

environment to which Safran had been exposed because of his good-faith demands for his wages.

30.     Thereafter, the Defendants continued their pattern of failing to pay Safran any

wages.  As a result of the Defendants' retaliatory conduct and continued failure to pay Safran

any wages, he had no choice but to resign from his employment, effective April 28, 2017, and

thus was constructively discharged by the Defendants.

31.     Even after Safran's constructive discharge, Beplate continued to threaten and

retaliate against Safran, including by falsely stating to Safran in July 2017 that the Securities &

Exchange Commission was looking into Safran's prior sale of UHP stock as alleged insider

trading and that there was going to be a purported shareholders' class action lawsuit with respect

to such selling by Safran.  When confronted with these outlandish allegations, Safran had to

incur the unnecessary expense of hiring an attorney experienced in securities law matters.  Not

surprisingly, when Safran's securities law attorney contacted Defendants' lawyer, Steve Morse,

with proof of Beplate's unlawful and false threats and wrongdoing, Beplate stepped back from

his threating conduct and acknowledged the falsity of his threats.  Of course, there was no

government investigation or threat of a class action lawsuit:  Beplate fabricated his threatening

assertions in an effort to intimidate Safran and retaliate against him for filing this lawsuit.

32.     As a direct and proximate result of Defendants' unlawful conduct, Safran has

incurred, and will continue to incur, a loss of wages and/or earning capacity, loss of the use of

his money and lost opportunities, emotional distress, embarrassment, humiliation, anxiety, stress,

loss of self-esteem and mental anguish, the full extent of which is not known at this time.

33.     Defendants' conduct, as set forth above, was in bad faith, malicious, willful,

wanton, intentional, reckless and outrageous under the circumstances.

## FIRST CAUSE OF ACTION
### (Breach of the Employment Agreement)

34.     Safran incorporates herein by reference paragraphs 1 through 33, as if set forth

herein in their entirety.

35.     Under the terms of the Employment Agreement, the Defendants were obligated to

pay Safran a monthly salary of $8,333, but failed to do so.  Rather, UHP paid Safran a total of

$16,000 only, as discussed above.  By failing to pay Safran his agreed-upon salary in the

Employment Agreement, the Defendants breached the Employment Agreement.

36.     Under the terms of the Employment Agreement, the Defendants were obligated to

pay Safran a commission equal to "2½% of net sales (gross saless less returns) on his managed

accounts."  Safran managed the account and was principally responsible for securing the $20

million sale with the California-based customer, as well as responsible for other sales to customers, and thus is entitled to a commission on any of UHP's sales to such customers.  By failing to pay Safran his commissions to date, the Defendants breached the Employment Agreement.

37.     As a direct result of the Defendants' breach of the Employment Agreement with Safran, he has sustained damages in the amount of no less than $245,823.50 in lost salary and an undetermined amount in lost commissions for his sales activity, which cannot be ascertained at this time and will be proven at trial, plus interest and attorneys' fees.

**SECOND CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing as to Employment Agreement)**

38.     Safran incorporates herein by reference paragraphs 1 through 37, as if set forth herein in their entirety.

39.     Under the terms of the Employment Agreement, the Defendants were obligated to pay Safran a salary of $8,333 per month, but have failed to do so.  Rather, UHP has paid him a total of $16,000 only.  By failing to pay Safran his agreed-upon salary in the Employment Agreement, the Defendants have breached the covenant of good faith and fair dealing.

40.     Under the terms of the Employment Agreement, the Defendants were obligated to pay Safran a commission equal to "2½% of net sales (gross saless less returns) on his managed accounts."  Safran managed the account and was principally responsible for securing the $20 million sale of UHP's products to the California-based customer, as well as responsible for other sales to customers, and thus is entitled to a commission on any of UHP's sales to such customers. By failing to pay Safran his commissions to date, the Defendants breached the covenant of good faith and fair dealing.

41.     As a direct result of the Defendants' breach of the implied covenant of good faith and fair dealing in connection with the Employment Agreement, Safran has sustained damages in the amount of no less than $245,823.50 in lost salary and an undetermined amount in unpaid commissions, plus interest and attorneys' fees.

42.     Defendants' conduct was in bad faith, willful and wanton, and warrants the imposition of punitive damages.

### THIRD CAUSE OF ACTION
### (Violation of NYLL for Failure to Pay Wages)

43.     Safran incorporates herein by reference paragraphs 1 through 42, as if set forth herein in their entirety.

44.     The Defendants failed to pay Safran his salary at the rate of $8,333 per month, or any other wages, except for $16,000, during his employment with UHP.  Thus, Defendants owe Safran no less than $245,823.50 in unpaid base salary alone, plus interest and liquidated damages of no less than $245,823.50.

45.     Given that the Defendants continually failed to pay Safran on a "salary basis," as required under the NYLL, he also is entitled to a significant amount of overtime pay since his date of hire, in an amount of at least $162,489.60, as set forth in paragraph 21 above, plus interest and liquidated damages of no less than $162,489.60.

46.     If the Defendants do not owe Safran his wages at the rate of $8,333 per month plus overtime pay, then, in the alternative, the Defendants owe him the applicable minimum wage and overtime rates in New York for all hours he worked during his employment at UHP, totaling $76,885.60, as set forth in paragraph 24 above, plus interest and liquidated damages of no less than $76,885.60.

47.     The Defendants were obligated to pay Safran a commission equal to "2½% of net sales (gross saless less returns) on his managed accounts."  Safran managed the account and was principally responsible for securing the $20 million sale of UHP's products to the California-based customer, as well as responsible for other sales to customers, and thus is entitled to commissions on any of UHP's sales to such customers under the NYLL.

48.     As a direct and proximate result of Defendants' violations of the NYLL, Safran has sustained lost wages and commissions, damages and losses set forth herein and has incurred attorneys' fees and costs.

49.     Defendants' conduct was willful, wanton and demonstrated a conscious disregard for Safran's rights under the NYLL, and warrants the imposition of liquidated damages.

50.     Safran is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' unlawful conduct unless and until this Court grants the relief requested herein.

## FOURTH CAUSE OF ACTION
### (Retaliation and Constructive Discharge Under the NYLL)

51.     Safran incorporates herein by reference paragraphs 1 through 50, as if set forth herein in their entirety.

52.     Safran attempted, in good faith, to be paid for his work as an employee, but the Defendants have willfully refused to pay him.  In fact, as described above, Beplate blatantly retaliated against Safran by threatening him between 2015 and early-2017 for demanding his unpaid compensation and complaining about the Defendants' violations of the NYLL.  Beplate also continued to threaten and retaliate against Safran in July 2017, as described above.

53.     As a result of the Defendants' retaliatory conduct and continued failure to pay Safran any wages, as described above, he had no choice but to resign from his employment,

14

effective April 28, 2017, and thus was constructively discharged by the Defendants in violation of the NYLL.

54.     As a direct and proximate result of Defendants' retaliation and constructive discharge of Safran under the NYLL, he has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

55.     Defendants' conduct was willful, wanton and demonstrated a conscious disregard for Safran's rights under the NYLL, and warrants the imposition of liquidated damages.

56.     Safran is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' unlawful conduct unless and until this Court grants the relief requested herein.

## FIFTH CAUSE OF ACTION
### (Violation of the FLSA for Failure to Pay Overtime)

57.     Safran incorporates herein by reference paragraphs 1 through 56, as if set forth herein in their entirety.

58.     The Defendants have failed to pay Safran his salary at the rate of $8,333 per month, or any other wages, except for a total of $16,000, during his employment with UHP. Given that the Defendants continually failed to pay Safran on a "salary basis," as required under the FLSA, he is entitled to a significant amount of overtime pay since his date of hire, in an amount of at least $162,489.60, as set forth in paragraph 21 above, plus interest and liquidated damages of no less than $162,489.60.

59.     As a direct and proximate result of Defendants' violations of the FLSA, Safran has sustained lost wages, damages and losses set forth herein and has incurred attorneys' fees and costs.

60.    Defendants' conduct was willful, wanton and demonstrated a conscious disregard for Safran's rights under the FLSA, and warrants the imposition of liquidated damages.

61.    Safran is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' unlawful conduct unless and until this Court grants the relief requested herein.

## SIXTH CAUSE OF ACTION
### (Retaliation and Constructive Discharge Under the FLSA)

62.    Safran incorporates herein by reference paragraphs 1 through 61, as if set forth herein in their entirety.

63.    Safran attempted, in good faith, to be paid for his work as an employee, but the Defendants have willfully refused to pay him.  In fact, as described above, Beplate blatantly retaliated against Safran by threatening him between 2015 and early-2017 for demanding his unpaid compensation and complaining about the Defendants' violations of the FLSA.  Beplate also continued to threaten and retaliate against Safran in July 2017, as described above.

64.    As a result of the Defendants' retaliatory conduct and continued failure to pay Safran any wages, as described above, he had no choice but to resign from his employment, effective April 28, 2017, and thus was constructively discharged by the Defendants in violation of the FLSA.

65.    As a direct and proximate result of Defendants' retaliation and constructive discharge of Safran under the FLSA, he has sustained the injuries, compensatory damages and losses set forth herein and has incurred attorneys' fees and costs.

66.    Defendants' conduct was willful, wanton and demonstrated a conscious disregard for Safran's rights under the FLSA, and warrants the imposition of liquidated damages.

67.     Safran is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' unlawful conduct unless and until this Court grants the relief requested herein.

### SEVENTH CAUSE OF ACTION
### (Breach of Contract for Failure to Repay Loans and Issue Stock)

68.     Safran incorporates herein by reference paragraphs 1 through 67, as if set forth herein in their entirety.

69.     The Defendants promised to repay Safran for his 2011 and 2014 loans, in the total amount of $80,000, but have not done so.  By failing to repay these loans to Safran, the Defendants have breached their contracts with Safran, including, but not limited to, the UHP's Code of Business Conduct and Ethics with respect to the 2014 loan.

70.     The Defendants promised to issue Safran at least 250,000 shares of common stock of UHP in November 2015 and other shares in September 2014, but have not done so.  By failing to issue these shares of UHP to Safran, the Defendants have breached their contract with Safran.

71.     As a direct result of the Defendants' breach of their agreements with Safran, he has sustained damages in the amount of $80,000 for the loans and the fair market value of at least 250,000 shares of common stock of UHP, plus interest and attorneys' fees.

### EIGHTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing as to Loans and Stock)

72.     Safran incorporates herein by reference paragraphs 1 through 71, as if set forth herein in their entirety.

73.     The Defendants promised to repay Safran for his 2011 and 2014 loans, in the total amount of $80,000, but have not done so.  By failing to repay these loans to Safran, the Defendants have breached the covenant of good faith and fair dealing.

74.     The Defendants promised to issue Safran 250,000 shares of common stock of UHP in November 2015 and other shares in September 2014, but have not done so.  By failing to issue these shares of UHP to Safran, the Defendants have breached the covenant of good faith and fair dealing.

75.     As a direct result of the Defendants' breach of the implied covenant of good faith and fair dealing in connection with their agreements with Safran, he has sustained damages in the amount of $80,000 for the loans and the fair market value of at least 250,000 shares of common stock of UHP, plus interest and attorneys' fees.

76.     Defendants' conduct was in bad faith, willful and wanton, and warrants the imposition of punitive damages.

**NINTH CAUSE OF ACTION**
**(Promissory Estoppel)**

77.     Safran incorporates herein by reference paragraphs 1 through 76, as if set forth herein in their entirety.

78.     Upon hiring Safran, the Defendants' promised him that they would compensate him for his work at the rate of $8,333 per month.  In good-faith and reasonable reliance on Defendants' promises and representations, Safran accepted the offer to be employed by UHP and continually performed work for UHP without compensation.

79.     The Defendants promised to pay Safran a commission equal to 2½% of net sales (gross saless less returns) on his managed accounts.  In good-faith and reasonable reliance on Defendants' promises and representations, Safran managed accounts and was principally responsible for securing the $20 million sale of UHP's products to the California-based customer, as well as responsible for other sales to customers, and thus is entitled to a commission on any of UHP's sales to such customers.

80.     The Defendants promised to repay Safran for his 2011 and 2014 loans, in the total amount of $80,000, but have not done so.  In making those loans to Defendants, Safran reasonably relied in good faith and to his detriment on the Defendants' promises and representations that they would repay him for those loans.

81.     The Defendants promised to issue Safran 250,000 shares of common stock of UHP in November 2015 and other shares in September 2014, but have not done so.  Safran reasonably relied in good faith and to his detriment on the Defendants' promises and representations that they would issue him these shares of common stock if Beplate could hold onto Safran's 500,000 shares of common stock of UHP until March 2016.

82.     By failing to pay Safran his salary and commissions, repay these loans to Safran or issue him at least 250,000 shares of common stock of UHP, the Defendants are liable under promissory estoppel.

83.     As a direct result of the Defendants' failure to adhere to and honor their promises and representations to Safran, on which he detrimentally and reasonably relied, he has sustained damages in the amount of over $245,823.50 in lost salary, an undetermined amount of commissions, $80,000 for the loans and the fair market value of at least 250,000 shares of common stock of UHP, plus interest and attorneys' fees.

## TENTH CAUSE OF ACTION
### (Fraud and Misrepresentation)

84.     Safran incorporates herein by reference paragraphs 1 through 83, as if set forth herein in their entirety

85.     Upon hiring Safran, the Defendants' falsely represented to him that they would compensate him for his work at the rate of $8,333 per month.  In good-faith and reasonable reliance on Defendants' promises and representations and without knowing them to be false,

19

Safran accepted the offer to be employed by UHP and continually performed work for UHP without compensation.

86.     The Defendants falsely represented to Safran that they would pay him a commission equal to 2½% of net sales (gross saless less returns) on his managed accounts.  In good-faith and reasonable reliance on Defendants' promises and representations and without knowing them to be false, Safran managed the account and was principally responsible for securing the $20 million sale of UHP's products to the California-based customer, as well as responsible for other sales to customers, and thus is entitled to commission on any of UHP's sales to such customers.

87.     The Defendants falsely represented to Safran that they would repay him for his 2011 and 2014 loans, in the total amount of $80,000, but have not done so.  In making those loans to Defendants, Safran reasonably relied in good faith and to his detriment on the Defendants' promises and representations that they would repay him for those loans, and without knowing them to be false.

88.     The Defendants falsely promised to issue Safran 250,000 shares of common stock of UHP in November 2015 and other shares in September 2014, but have not done so.  Safran reasonably relied in good faith and to his detriment on the Defendants' promises and representations that they would issue him these shares of common stock if Beplate could hold onto Safran's 500,000 shares of common stock of UHP until March 2016, and without knowing them to be false.

89.     By failing to pay Safran his wages or commissions, failing to repay these loans to Safran and/or failing to issue him the shares of UHP common stock in question, the Defendants engaged in fraud and misrepresentation.

20

90.     As a direct result of the Defendants' failure to adhere to and honor their promises and representations to Safran, on which he detrimentally and reasonably relied without knowing them to be false, he has sustained damages in the amount of over $245,823.50 in lost salary, an undetermined amount of commissions, $80,000 for the loans and the value of at least 250,000 shares of common stock of UHP, plus interest and attorneys' fees.

91.     Defendants' conduct was in bad faith, willful and wanton, and warrants the imposition of punitive damages.

## ELEVENTH CAUSE OF ACTION
### (Conversion of $80,000 in Loans)

92.     Safran incorporates herein by reference paragraphs 1 through 91, as if set forth herein in their entirety.

93.     Defendants received two loans from Safran:  $30,000 in 2011 and $50,000 in 2014.  The Defendants were obligated to repay those loans to Safran and, despite promising to do so, have not done so.

94.     By failing to repay the loans to Safran and continuing to keep the proceeds of the loans, the Defendants have wrongfully converted property belonging to Safran.

95.     As a direct and proximate result of the Defendants' wrongful possession and conversion of the loans, Safran has sustained the damages and losses set forth herein – namely, $80,000 plus interest – and has incurred attorneys' fees and costs.

96.     The Defendants' conduct was in bad faith, willful and wanton, and warrants the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Safran prays that this Court enter judgment in his favor and against the Defendants, jointly and severally, and grant to him the following relief:

A. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein constitute breach of the Employment Agreement and the breach of the covenant of good faith and fair dealing with respect to the Employment Agreement;

B. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violate the FLSA and NYLL;

C. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein with respect to the Defendants' failure to repay the loans to Safran or issue him at least 250,000 shares of UHP common stock constitutes a breach of contract;

D. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein with respect to the Defendants' failure to repay the loans to Safran or issue him at least 250,000 shares of UHP common stock constitutes a breach of the covenant of good faith and fair dealing;

E. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein with respect to the Defendants' failure to pay wages and commissions to Safran, repay the loans to Safran or issue him at least 250,000 shares of UHP common stock constitutes fraud and misrepresentation;

F. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein with respect to the Defendants' failure to pay wages

and commissions to Safran, repay the loans to Safran or issue him at least 250,000 shares of UHP common stock makes Defendants liable under the theory of promissory estoppel;

   G. A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein with respect to the failure to repay the loans to Safran constitute the conversion of property;

   H. An order restraining the Defendants from engaging in continuing unlawful conduct toward Safran, including an order directing the Defendants to take such affirmative action as is necessary to ensure that the effects of their unlawful and retaliatory conduct end and do not continue to affect Safran's employment or personal life;

   I. An award for all lost wages, loss of his use of money or lost opportunity, and economic damages to be determined at trial, plus pre-judgment interest, to compensate Safran for the Defendants' unlawful conduct, including back pay, overtime pay and front pay;

   J. An award for all compensatory damages to be determined at trial, plus pre-judgment and post-judgment interest, to compensate Safran for future pecuniary losses, emotional distress, pain, suffering, inconvenience, mental anguish, stress, anxiety, humiliation, embarrassment, loss of enjoyment of life and other nonpecuniary losses as allowable;

   K. An award to Safran against the Defendants for liquidated and punitive damages;

   L. An order requiring the Defendants to issue Safran at least 250,000 shares of UHP common stock;

M.    An award to Safran for the attorneys' fees and costs incurred in connection

this lawsuit; and

N.    An award to Safran such other and further relief as this Court deems

appropriate.

## **JURY DEMAND**

Safran demands a trial by jury on all issues of fact, his claims and damages herein.

Dated:  New York, New York
         January 26, 2018

CERASIA & DEL REY-CONE LLP

By  s/ Edward Cerasia II
    Edward Cerasia II
    Alison L. Tomasco
150 Broadway, Suite 1517
New York, New York 10038
646.525.4231

Attorneys for Plaintiff
 *Steven Safran*

24